IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

SHAUNE BURNS,                          )
                                       )
            Plaintiff,                 )
                                       )
vs.                                    )    Case No. 3:19-CV-771-MAB
                                       )
LORI JACKMAN,                          )
HEATHER ELLISON, and                   )
WEXFORD HEALTH SOURCES, INC.,          )
                                       )
            Defendants.                )

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on the motion for summary judgment filed by Defendants Heather Ellison, Lori Jackman, and Wexford Health Sources, Inc. (Doc. 113; *see also* Doc. 114). For the reasons set forth below, the motion is granted.

## BACKGROUND

Plaintiff Shaune Burns, an inmate of the Illinois Department of Corrections, brought this civil action pursuant to 42 U.S.C. § 1983, alleging Wexford Health Sources, Inc. and staff at Lawrence Correctional Center were deliberately indifferent to his serious medical needs by failing to provide timely refills of his medications (Docs. 71, 73). Plaintiff reached a settlement with Defendants Lorie Cunningham and Dee Dee Brookhart (Docs. 108, 121), so the claims remaining are as follows against Defendants Lori Jackman, Heather Ellison, and Wexford Health Sources, Inc.:

> **Count 1:** Eighth Amendment claim of deliberate indifference to a serious medical need against Heather Ellison for failing to ensure that Burns received treatment, including a refill of omeprazole, on April 20, 2018.
>
> **Count 2:** Eighth Amendment claim of deliberate indifference to a serious medical need against Lori Jackman for repeatedly failing to provide Burns with timely refills of his medications.
>
> **Count 4:** Eighth Amendment claim of deliberate indifference to a serious medical need against Wexford by implementing a policy that delays the timely receipt of medication refills.

Defendants Ellison, Jackman, and Wexford filed a motion for summary judgment (Doc. 113; *see also* Doc. 114), to which Plaintiff filed a response in opposition (Doc. 118). Defendants did not file a reply brief.

## SEALED EXHIBITS

As an initial matter, the Court must deal with three exhibits attached to Defendants' motion for summary judgment that were filed under seal without leave of Court (*see* Docs. 114-4, 114-6, 114-9). Doc. 114-4 is a one-page Pharmacy Guideline from Wexford regarding medication refills. Doc. 114-6 is four pages of Plaintiff's mental health records. And Doc. 114-9 is an email chain that began with an email from Defendant Heather Ellison to a doctor regarding Plaintiff refusing his mental health medications. While each of these documents were designated as "confidential" in the discovery process, and "[s]ecrecy is fine at the discovery stage before the material enters the judicial record[,]" *Baxter Int'l., Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002), that designation does not automatically mean the documents can be filed on the docket under seal.

"Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010). *See also Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) ("People who want secrecy should opt for arbitration. When they call on the courts, they must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials."); *Baxter Int'l*, 297 F.3d at 546 ("In civil litigation only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault), is entitled to be kept secret . . . .").

The Court has reviewed the exhibits and is skeptical that confidentiality is warranted. But before unsealing the exhibits, the Court will give Defendants a chance to object. Plaintiff will also be given a chance to weigh in because the Court assumes he has the most pointed interest in keeping his mental health records a secret. Accordingly, the parties shall have until **April 5, 2023** to advise the Court whether they believe any of the documents at issue should remain sealed for good cause. They must provide detailed analysis with specific reasons why secrecy should be maintained as well as legal citations that support their position. If no response is filed, or the parties fail to provide the Court with a compelling justification, the exhibits will be unsealed.

## FACTS[1]

Wexford Health Sources, Inc. is a private corporation that contracted with the Illinois Department of Corrections to provide medical services at correctional facilities in Illinois, including Lawrence (Doc. 114-2, ¶2). Defendant Lori Jackman is employed by Wexford as a Medication Room Assistant at Lawrence (Doc. 114-2, ¶2). Jackman is responsible for placing orders with the pharmacy (by phone, fax, and/or electronically) to get prescription medications filled/refilled (*Id.* at ¶¶4, 5). She receives new prescription requests directly from health care providers and refill requests for non-expired prescriptions from inmates (*Id.* at ¶6).

Wexford's Medication Refill Policy requires patients to request refills three to four days before the original order is depleted, but no more than seven days in advance of medication running out (Doc. 114-4; Doc. 114-2, ¶9). Inmates must request refills by submitting a written request that includes a sticker from the label of the medication they wish to have refilled (Doc. 114-2, ¶8). Medication orders are typically filled by the pharmacy within 24 hours (*Id.* at ¶12). Jackman is responsible for taking the filled/refilled medications to the medication room at the facility, where they are picked up by nurses for delivery to inmates (*Id.* at ¶13).

If the refill request is premature, Jackman places the request in a "tickler system," which is a folder that she checks every day for refills that have come due (*Id.* at ¶11). If

---

[1] In their motion for summary judgment, Defendants set forth a lengthy statement of facts (Doc. 114, pp. 2–14), which Plaintiff "adopted" wholesale (*see* Doc. 118, p. 2). Plaintiff did not assert any additional facts of his own (*see* Doc. 118).

the prescription is expired—meaning no more refills are permitted by the original prescription (zero refills remaining)—the inmate must submit a medical request through the nurse sick call process to get the prescription renewed by their practitioner, rather than communicating with Defendant Jackman or the pharmacy (*Id.* at ¶7).

Plaintiff Shaune Burns was transferred to Lawrence on April 16, 2018 (Doc. 114-1, p. 1). He suffers from a number of medical conditions and had dozens of different medications prescribed to him throughout 2018, 2019, and 2020 (*see* Docs. 114-1, 114-7). In particular, Plaintiff was at some point diagnosed with an H. pylori infection[2] and thereafter prescribed omeprazole to manage his symptoms (*see* Doc. 73, p. 4–5). He alleged that if he does not consistently take omeprazole, he becomes very sick, vomiting blood with intense burning in his throat and chest (*see id.*). He further alleged that he was told by a physician that if H. pylori goes untreated, it can progress into cancer (*Id.*).

Plaintiff testified at his deposition that he knew it was his responsibility to request refills of his medication (Doc. 114-8). He further testified that he knew his medication orders would expire at some point and it was his responsibility to ask for an additional appointment to be evaluated for a new order of the medication (*Id.*). With respect to the delayed prescription refills at the heart of this case, Plaintiff asserts in his verified complaint that there were six incidents (Doc. 73), which Defendants recounted in their

---

[2] Helicobacter pylori (H. pylori) is a bacteria that can infect your stomach and cause peptic ulcers. Signs or symptoms of an H. pylori infection include an ache or burning pain in the abdomen, nausea, loss of appetite, frequent burping, bloating, and unintentional weight loss. MAYO CLINIC, *Helicobacter pylori infection*,   https://www.mayoclinic.org/diseases-conditions/h-pylori/symptoms-causes/syc-20356171 (last visited March 21, 2023).

motion for summary judgment (Doc. 114, p. 17). Defendants also went through Plaintiff's medical records and grievance records and noted additional instances where Plaintiff complained about running out of one medication or another (*see* Doc. 114, pp. 6–13). Collectively there were 10 instances, which are listed below in chronological order with the relevant facts laid out.[3]

**April 2018:** Plaintiff alleged in the complaint that after he arrived at Lawrence on April 16, 2018, he went "28 days without his omeprazole, 35 days without . . . Haldol, and 10 days without Congentin" (Doc. 73, p. 5).

With respect to Haldol and Congentin, which are both mental health medications (Doc. 114-3, ¶¶12, 13), neither medication is listed on the transfer summary sheet from the previous facility (Doc. 114-1, p. 1). And the medication administration records likewise do not indicate that either medication was administered to Plaintiff at the previous facility (*see id.* at pp. 22, 24–26). Rather, the mental health records currently before the Court indicate the first time Plaintiff was prescribed Haldol and Congentin at Lawrence was in October 2018—six months after his arrival at the facility (Doc. 114-6, p. 1; *see also* Doc. 114-1, pp. 22–39). While the practitioner acknowledged that Plaintiff had previously been prescribed these same medications, the record does not specify when that was, and, again, there is no evidence that it was in April 2018 when Plaintiff arrived

---

[3] To the extent there were other incidents not included in this list, the Court does not consider them to be a part of Plaintiff's claims in this case. Plaintiff did not specifically point them out in his complaint or his response to the motion for summary judgment (*see* Doc. 73, Doc. 118), and the Court is not obligated to search through the records to uncover them. *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) (the court "will not scour a record to locate evidence supporting a party's legal argument.").

at Lawrence (*See* Doc. 114-6, p. 1 ("Patient is in agreement with restarting Haldol and Cogentin. He said that this medication regimen was helpful for him before.")). The medication administration records demonstrate both medications were consistently administered to Plaintiff, except when he refused them (*see* Doc. 114-1, pp. 22–89; Doc. 114-7, pp. 51–100).

As for the omeprazole, Plaintiff alleged that when he did not receive his omeprazole upon his arrival at Lawrence, he "submitted a written request to defendant Jackman via the pharmacy department, inquiring about said medication" (Doc. 73, p. 4). Plaintiff further alleged that he did not receive the medication until May 14, 2018, after going 28 days without it (*Id.*).

The medical records indicate that at the time Plaintiff arrived at Lawrence, he was prescribed three "chronic long-term medications," including Omeprazole 20mg daily (Doc. 114-1, pp. 1, 2). During Plaintiff's intake at Lawrence, these three medications were continued for him through May 2nd (*Id.* at pp. 2, 23).[4] Additionally, a blood draw was scheduled for April 20th and an appointment with the nurse practitioner was scheduled for April 25th (*Id.* at p. 3).

Plaintiff was taken to the health care unit on April 20th as scheduled for a blood draw, which was done by Defendant Heather Ellison (Doc. 114-1, p. 4; Doc. 114-3, ¶7). He filed an emergency grievance two days later on April 22nd complaining that when he

---

[4] In the Medication Administration Record for April 2018 regarding omeprazole, there is a smudged notation on April 18th that appears to read "NS Reiss 21" (Doc. 114-1, p. 23). The Court is unsure what this notation means.

got his blood drawn, he told "medical staff" that he had not had any of his medications and was not feeling right (Doc. 114-5, p. 10). He also said that because he was not getting his omeprazole, he had been spitting up all day and night (*Id*.). He said he showed them a milk carton containing the substance he had been spitting up but they did not provide him with any treatment or take him to see a doctor (*Id*.). He asked to see a doctor right away and to be put on antibiotics (*Id*.).

Heather Ellison testified via affidavit that she is employed by Wexford as a Mental Health Registered Nurse at Lawrence (Doc. 114-3, ¶2). In her capacity as a mental health nurse, she is occasionally responsible for drawing blood from patients for laboratory testing (*Id*. at ¶3). But, as a nurse, she cannot write a prescription or order medication (*Id*. at ¶5). And as a mental health nurse, she is never responsible for dispensing medications for physical conditions, such as Omeprazole, stool softeners, and pain medications (*Id*. at ¶4). Nurse Ellison further testified that inmates must request medical care for all "non-urgent and non-emergent" issues by submitting a request to be seen at nurse sick call, "not by speaking with a nurse who is drawing blood" (*Id*. at ¶9). However, if she observed any medical conditions that required urgent or emergency treatment, her practice and custom was to notify the on-site medical provider (*Id*. at ¶10). Given that she did not do so for Plaintiff on April 20th, Nurse Ellison surmised that either Plaintiff did not show her a milk carton filled with spit up, or if he did show her, she determined based on her clinical judgment that his condition was not urgent or emergent and should be handled through the nurse sick call process (*Id*.). "In other words, even if Plaintiff showed [her] a milk carton with bloody spit/vomit and complained that he needed a refill of

Omeprazole, [her] only recourse would have been to advise him to send in a sick call request and . . . a refill request slip to the pharmacy" (*Id.* at ¶9).

On April 24th, Plaintiff reported at nurse sick call that he needed his medication for H. Pylori (Doc. 114-1, p. 5). The nurse noted he was scheduled to be seen by a nurse practitioner or doctor the following day to address the request (*Id.*; *see also id.* at p. 3). However, time restraints prevented Plaintiff from seeing the nurse practitioner the next day and he was "rescheduled [for the] next available date" (*Id.* at p. 6), which appears to have been May 11th (*see id.* at p. 7). The medication administration records indicate that, in the meantime, Plaintiff was given 15 tabs of omeprazole on April 27th (*Id.* at p. 23).

Plaintiff then saw Nurse Practitioner (NP) Stover on May 11th regarding his request to renew H. Pylori medications (Doc. 114-1, p. 7). Plaintiff reported, amongst other things, having H. Pylori "for many years" (*Id.*). He said he had been out of his medication for "4 days" and had been "spitting up foam for some time now" (*Id.*).[5] Plaintiff reported being told previously that he needed an antibiotic regimen when he had this problem (*Id.*). NP Stover observed Plaintiff was spitting up foamy sputum frequently (*Id.*). She wrote a year-long prescription for Omeprazole (20mg, twice a day) and Tums (two tabs, twice a day), ordered a ten-day course of two antibiotics (amoxicillin and clarithromycin), and dispensed 12 Tums and "2 cards" of amoxicillin to Plaintiff on the spot (*Id.*; *see also id.* at p. 26). She told him to follow-up as needed (*Id.*).

The medication administration records indicate Plaintiff received a 30-day supply

---

[5] Notably, Plaintiff did not report that he had been out of his medication since his arrival at Lawrence on April 16th (25 days earlier), which is what he alleged in the complaint.

of omeprazole (60 tablets) five days later, on May 16th (Doc. 114-1, p. 27). He saw NP Stover that same day and she noted that Plaintiff was "still having issues but just got meds" (*Id.* at p. 8). She gave him twelve more Tums and two more cards of amoxicillin (*Id.* at p. 8, 29). Plaintiff was given a full supply of Tums four days later on May 20th (*Id.* at p. 27).

**November 2018:** The medical records show that in November 2018, Plaintiff complained that he had not received the Excedrin migraine medication he was prescribed six days prior (Doc. 114-1, p. 10; Doc. 114-6, p. 2). Specifically, Plaintiff saw NP Stover on November 9, 2018, where he reported headaches which caused nausea and vomiting and said his legs and back were still sore from a fall injury (Doc. 114-1, p. 9). NP Stover ordered Excedrin Migraine for three months and Tramadol for six months to treat Plaintiff's pain (*Id.*). Plaintiff came back just six days later, on November 15th, indicating that he never received the Excedrin Migraine ordered at the previous visit (*Id.* at p. 10).[6] NP Stover documented that Plaintiff "appears in pain. Eyes squinted. Sweating." (*Id.* at p. 10). She gave Plaintiff a dose of Phenergan in the office and dispensed Excedrin Migraine to him (*Id.*).

**December 2018**: Plaintiff filed a grievance on December 18, 2018, complaining that his omeprazole ran out despite putting in multiple renewal requests, which he said caused him to get very sick and he had to be put on two antibiotics as a result (Doc. 114-5, p. 8). He begged the administration to "stop letting my meds run out" (*Id.*).

---

[6] The medication administration records include a notation of "0" on November 9th (*Id.* at p. 40), although there is no explanation as to what that notation means.

The records, however, tell a different story. They indicate that Plaintiff received a thirty-day supply of omeprazole (60 tablets) on October 31st, another 60 tablets on either November 17th or November 20th, and another 60 tablets on December 13th (Doc. 114-1, pp. 38, 42, 43; *see also* Doc. 114-5, p. 7). Furthermore, at an appointment on December 7th, where Plaintiff complained about H. pylori, spitting up mucus, and constipation, he told NP Stover that "he just needs the double [antibiotics], *he has the omeprazole*" (Doc. 114-1, p. 11) (emphasis added). Plaintiff's December 18th grievance was denied because, as the Health Care Unit Administrator explained, Plaintiff was on many medications, including omeprazole that were reissued on several occasions, with the most recent being less than a week before Plaintiff filed his grievance (Doc. 114-5, p. 7).

**May 2019:** Plaintiff alleged in the complaint that he submitted refill requests on May 16, 2019, for Topiramate (brand name Topamax), docusate (brand name Colace), Excedrin, and omeprazole (Doc. 73, p. 4). Plaintiff further alleged that Defendant Jackman did not respond to his request or provide him with a refill for his medications before he ran out (*Id.*).

The records, however, indicate that Plaintiff received a 30-day supply of topiramate (a 60 tablets) on May 4th—less than two weeks before he supposedly asked for a refill (Doc. 114-1, p. 59; *see id.* at p. 62). He received another 30 (or 60; it is unclear) on May 25th, long before his supply would have run out (Doc. 114-1, p. 59; *see id.* at p. 62). Plaintiff received 120 Excedrin on May 4th and another 80 on May 25th, before his prescription ultimately expired on June 12th (Doc. 114-1, p. 59). And he was given a 30-day supply of Colace (60 tablets) on April 26th, and 29 days later on May 25th he received

another 60 tablets (*Id.* at p. 59).

With respect to the omeprazole, he received a 30-day supply (60 tablets) on April 6th (Doc. 114-1, p. 56). He was not given any more before his prescription for omeprazole expired on May 14th (*see id.* at pp. 56, 58). Plaintiff filed a grievance on May 29, 2019, complaining about running out of omeprazole, which he said was "the 6th or 8th time you all have late [sic] my medication run out" (Doc. 114-5, p. 6). Then on June 2nd, Plaintiff saw a nurse and complained that he had run out of omeprazole and had been vomiting and had abdominal pain for the past four days (Doc. 114-1, p. 15). The nurse referred Plaintiff to the doctor (*Id.*), whom Plaintiff saw the next day (*Id.* at p. 16). Plaintiff told the doctor that he ran out of omeprazole eight days prior and had requested a refill three weeks prior (*Id.*). The doctor prescribed a two-week course of two antibiotics and re-issued Plaintiff's prescriptions for omeprazole and Tums for six months and also wrote a new six-month prescription for Pepcid (*Id.*). Both the omeprazole and Pepcid were dispensed to Plaintiff on June 4th (Doc. 114-1, pp. 63). Shortly thereafter, the grievance officer recommended upholding the grievance regarding Plaintiff's omeprazole, writing "order expired on 5/14/19 . . . rewritten on 6/3/19. Issued according to [medication administration records] documentation on 2/21/19 and 4/6/19. Dates of errors 5/6/19. Placed on MD line to determine level of error." (Doc. 114-5, p. 5).

**August 2019:** On August 1, 2019, Dr. Pittman reissued Plaintiff's prescription for Excedrin Migraine for two tablets twice a day, for twelve months (Doc. 114-1, p. 17; *see also id.* at pp. 71, 74). Eight days later, on August 9th, Plaintiff filed an emergency grievance, complaining that the prescription had yet to be filled (Doc. 114-5, pp. 1–4).

Records show that he was given 60 Excedrin that same day, and 60 more on August 14th (Doc. 114-1, p. 67). The grievance officer recommended that the grievance be affirmed and noting there was a "delay [in] issuing medication." (Doc. 114-5, p. 3). Health Care Unit Lorie Cunningham later indicated the eight-day delay between the date the medication was prescribed, and the date Plaintiff received it, was because there was "not enough staff to issue medication as ordered by provider" (*Id.* at p. 1).

**September 2019:** Plaintiff alleged that he submitted a refill request on September 19, 2019, for docusate, laxative, Amlodipine, and Excedrin (Doc. 73, p. 5). Plaintiff further alleged that he did not get the docusate until October 1st, which was four days after his supply ran out; he did not get the Excedrin or laxative until October 20th, which was 24 days after his supply ran out; and he never received the amlodipine "because he was in segregation by the time this medication was finally refilled" (*Id.*).

Starting with the Excedrin, the medication administration indicate, and Plaintiff admitted (*see* Doc. 118, p. 2; Doc. 114, ¶46), that he received 60 tabs of "Pain Reliever Plus" on September 16th—just three days before he supposedly requested a refill—which should have lasted him a minimum of 15 days (Doc. 114-1, p. 71). The medication administration further indicate that he received 60 more on October 5th and 60 more on October 29th (*Id.* at pp. 74, 80).

As for the laxatives, there is no evidence that he had an active prescription with refills remaining as of September 19, 2019. Specifically, the records show Plaintiff was prescribed magnesium citrate on two occasions in March 2019, but each time was only for a brief duration and without any refills (*see* Doc. 114-1, pp. 52, 54; *see also id.* at pp. 12,

13). Plaintiff was also prescribed Fiberlax on March 29, 2019 (Doc. 114-1, p. 13), but the order was only for three months, and it expired on June 24, 2019 (*see id.* at pp. 13, 58). Plaintiff saw the doctor on October 15th and she ordered magnesium citrate, Fiberlax, and Colace to treat Plaintiff's constipation (Doc. 114-1, p. 19). Each prescription was for eight weeks (*Id.*).

With respect to docusate (Colace), the prescription order instructs Plaintiff to take "two capsules by mouth at bedtime as needed" (*e.g.*, Doc. 114-1, p. 69). The medication administration records indicate that Plaintiff was given 60 Colace capsules on August 14th (*Id.*). He did not receive any more until 48 days later on October 1st (*Id.* at p. 73), (like Plaintiff claimed), which was 12 days after his refill request was submitted.

The prescription order for amlodipine instructs Plaintiff to take one daily (*e.g.*, Doc. 114-1, p. 69). The medication administration records indicate that Plaintiff was given 30 amlodipine on August 21st (Doc. 114-1, p. 69). He did not receive more until 45 days later on October 5th (*Id.* at 73), which was 16 days after his refill request was submitted

**October 2019:** Plaintiff alleged in the complaint that he submitted a refill request on October 14, 2019, for omeprazole (Doc. 73, pp. 5–6). He further alleged that he did not get it until several days after his supply ran out (*Id.*). The records show that Plaintiff received a 30-day supply on September 20th (60 tablets) (Doc. 114-1, pp. 70, 74). He did not receive more until 34 days later on October 24th, (*Id.* at p. 74), which was 10 days after his refill request was submitted.

**March 2020:** Plaintiff told a nurse on March 16, 2020 that he ran out of fiber pills (Doc. 114-7, p. 22). The records show that Fiberlax was ordered in mid-December 2019

for eight weeks (Doc. 114-1, p. 21; *see also* Doc. 114-7, p. 52). He received a 30-day supply on December 17th (60 tablets) (Doc. 114-1, p. 88), another 60 tablets on January 15th, and another 60 tablets on February 9th (Doc. 114-7, p. 52, 55). Plaintiff does not allege, and there is no evidence, that he requested a refill before the prescription expired on March 9th (*see id.*; *see also* Doc. 73, Doc. 118). The prescription was renewed on March 24, 2020, for one year (*Id.* at p. 23; *see also id.* at p. 57). Plaintiff received a 30-day supply (60 tablets) four days later on March 28th (Doc. 114-7 p. 88).

**April 2020**: Plaintiff alleged in the complaint that he submitted a refill request on April 5, 2020, for docusate (Colace), laxative, and omeprazole, but he "went (11) eleven days without his laxative and docusate before he was provided a refill, and four days without his omeprazole before it was refilled" (Doc. 73, p. 6).

With respect to the omeprazole, the records indicate that Plaintiff received a 30-day supply (60 tablets) on March 12th (Doc. 114-7, pp. 57, 86). He properly requested a refill on April 5th, seven days before his previous 30-day supply was set to run out. He did not receive more until April 17th, (*Id.* at p. 59), which was 36 days after he last received any Omeprazole and 12 days after he submitted his refill request.

As for the docusate and Fiber-lax, the records show that Plaintiff received a 30-day supply of each on March 28th (Doc. 114-7 p. 88), which was just one week before he supposedly submitted his refill request and obviously before he was due for a refill. But then he did not receive more docusate or Fiber-lax until May 9th, which was 42 days after he last received either medication (*Id.* at p. 97).

**May 2020:** Plaintiff alleged in the complaint that he submitted a refill request on

May 3, 2020, for hemorrhoid cream but did not get it until after he had run out (Doc. 73, p. 6). The records show that he received his refill on May 9th, six days after he submitted his refill request (Doc. 114-7, p. 97).

**LEGAL STANDARDS**

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Under Rule 56, the movant has the initial burden of informing the court why a trial is not necessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). When the movant does not bear the burden of persuasion on a particular issue at trial, like Defendants in this case, the movant is not required to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Modrowski*, 712 F.3d at 1168 (citation omitted; emphasis in original). Rather, the movant can discharge their initial burden by pointing out to the court that there is an absence of evidence to support the nonmovant's case. *Id.*

The party opposing summary judgment, in this case Plaintiff, bears the burden of coming forward with properly supported arguments or evidence to show the existence of a genuine issue of material fact." *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted).

In deciding a motion for summary judgment, the court "must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). The court need only consider the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). However, the Seventh Circuit has repeatedly stressed that courts are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *E.g., Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572–73 (7th Cir. 2017).

The Eighth Amendment's proscription against cruel and unusual punishment creates an obligation for prison officials to provide inmates with adequate medical care. *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, (1994)). Evaluating whether the Eighth Amendment has been violated involves a two-prong analysis. The court first looks at whether the plaintiff suffered from an objectively serious medical condition and, second, whether the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *E.g., Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). In applying this test, the court "look[s] at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728–29 (7th Cir. 2016).

Defendants make no argument that Plaintiff was not suffering from a serious medical condition (*see* Doc. 114). Consequently, the question for the Court is whether Defendants acted with a sufficiently culpable state of mind. A prison official exhibits

deliberate indifference when they know of a serious risk to the prisoner's health exists but they consciously disregard that risk. *Holloway*, 700 F.3d at 1073 (citation omitted). "The standard is a subjective one: The defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference." *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (quoting *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016)). The deliberate indifference standard "requires more than negligence and it approaches intentional wrongdoing." *Holloway*, 700 F.3d at 1073. It is "essentially a criminal recklessness standard, that is, ignoring a known risk." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (citation omitted).

DISCUSSION

## A.  NURSE ELLISON

In Count 1, Plaintiff alleges that Nurse Ellison was deliberately indifferent when she failed to provide him with any treatment or ensure that he received treatment, including a refill of omeprazole, when she saw him on April 20, 2018. The Court finds that Nurse Ellison is entitled to summary judgment on Count 1.

It is undisputed Nurse Ellison cannot prescribe medications. It is also undisputed that she only saw Plaintiff for a blood draw, and non-emergency medical issues are not addressed during a blood draw. Rather, the prisoner must pursue treatment through the sick call process. (This comes as no surprise given that it is the same for people outside of prison—an appointment for a blood draw is limited to just that.) However, if an inmate is having an emergency medical issue, Nurse Ellison testified that it was her normal custom and practice to notify the on-site medical provider. Assuming that Plaintiff

showed her the cup of spit up during the blood draw, as he claimed, and based on the fact that she did not summon the on-site practitioner for Plaintiff, Nurse Ellison surmised that she had determined "based on [her] nursing assessment" that Plaintiff's condition was not urgent or emergent and was appropriately referred to nurse sick call (Doc. 114-3, ¶¶2–3). "[A] treatment decision that's based on professional judgment cannot evince deliberate indifference." *Lewis v. McLean*, 941 F.3d 886, 894 (7th Cir. 2019) (quoting *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016)). Likewise, requiring an inmate to use the established procedure to seek relief for a non-emergent condition does not constitute deliberate indifference. *See Rankin v. Baker*, 770 Fed. Appx. 752 (7th Cir. 2019); *Lowe v. Kaplan*, 308 Fed. Appx. 993, 996 (7th Cir. 2009). Plaintiff made no argument and presented no evidence from which it could be inferred that his condition on April 20, 2018, *was* a medical emergency that required *immediate*, on-the-spot medical attention (*see* Doc. 118, pp. 2–3), nor is it blatantly obvious to the Court. Consequently, there is no evidence from which a jury could conclude that Nurse Ellison acted with deliberate indifference, and she is entitled to summary judgment on Count 1.

## B.  LORI JACKMAN & WEXFORD HEALTH SOURCES

In Count 2, Plaintiff alleges that Lori Jackman was deliberately indifferent when she repeatedly failed to provide him with timely refills of his medications. And in Count 3, Plaintiff alleged Wexford was deliberately indifferent in implementing and maintaining a policy that resulted in a failure to timely refill his prescription medications.

Underlying these claims are the ten instances outlined in the factual background section of this Order where Plaintiff's medications were allegedly delayed in reaching

him. After scrutinizing each of these alleged incidents, the Court has determined that not every incident, or every medication within each incident, can be considered due to failures of proof, as further explained below.

First, **the April 2018 incident**, where Plaintiff alleged that he went "28 days without his omeprazole, 35 days without . . . Haldol, and 10 days without Congentin" following his arrival at Lawrence (Doc. 73, p. 5; Doc. 114, p. 17). As demonstrated by the facts, there is no evidence in the record that Plaintiff was prescribed either Haldol or Congentin at the time he arrived at Lawrence. Furthermore, Plaintiff contradicted his own allegations when, in his response to the motion for summary judgment, he "adopted" the facts set forth by Defendants that he was not prescribed either medication at Lawrence until October 2018 and that they were consistently administered to him (Doc. 118, p. 2). Plaintiff offered no other facts regarding any delay in receiving Haldol or Cogentin (*see* Doc. 73, Doc. 118), and made no argument regarding these medications (*see* Doc. 118). Consequently, anything regarding these two medications is excluded from the scope of Plaintiff's claims, and the April 2018 incident will only be considered with respect to the omeprazole.

Next, **the December 2018 incident**, in which Plaintiff filed a grievance indicating that he requested a refill of omeprazole but there was a delay in receiving the refill (Doc. 114-5, p. 8). Plaintiff did not specify in the grievance when that lapse occurred (*see id.*), and the records suggest that Plaintiff never went without omeprazole in the days leading up to his grievance. Specifically, the records indicate that he received a thirty-day supply of omeprazole on October 30th. Before that supply ran out, he received another 30-day

refill on November 17th or 20th. And before that supply ran out, he received another 30-day refill on December 13th (Doc. 114-1, pp. 38, 42, 43; *see also* Doc. 114-5, p. 7). Because he received a refill on December 13th—which was less than a week before he filed his grievance—the grievance was denied (Doc. 114-5, p. 7). In his response to the motion for summary judgment, Plaintiff "adopted" the facts set forth by Defendants regarding the status of his omeprazole prescription in December 2018, essentially admitting there was no lapse in getting his prescription refilled (Doc. 118, p. 2). Consequently, this incident will be excluded from the scope of Plaintiff's claims.

Next, **the May 2019 incident**, in which Plaintiff alleged that he submitted refill requests on May 16, 2019, for topiramate, docusate, Excedrin, and omeprazole but there was a delay in receiving the refills (Doc. 73, p. 4; Doc. 114, p. 17). The records belie Plaintiff's allegations regarding topiramate, docusate, and Excedrin. Specifically, the records show that he was given a 30-day supply of topiramate and 120 Excedrin on May 4th. Therefore, he was not due for refills on May 16th when he allegedly requested them. Both medications were then refilled on May 25th, well before his previous supply would have run out. Consequently, the nine-day delay between the time Plaintiff requested the refills and when he received the medications appears justified and certainly does not implicate any concerns of deliberate indifference, or even negligence. The same goes for the docusate. Plaintiff received a 30-day supply of docusate (60 tablets) on April 26th and a refill 29 days later on May 25th, suggesting he never ran out of the medication. Plaintiff made no attempt in his response to the motion for summary judgment to explain the discrepancy between his allegations and the medical records (*see* Doc. 118). In fact,

Plaintiff "adopted" the facts set forth by Defendants, essentially admitting there was no lapse in these prescriptions (Doc. 118, p. 2). Consequently, Plaintiff's allegations regarding topiramate, docusate, and Excedrin will be excluded.

As for the omeprazole, Plaintiff's grievance on the issue was upheld because it appeared from the records there was an error made by prison officials in refilling Plaintiff's prescription before it expired on May 14th (Doc. 114-5, p. 5). Notably, however, the grievance officer did not indicate if and when Plaintiff had requested a refill or went to nurse sick call seeking to have the prescription renewed prior to it expiring. There is also no evidence regarding the health care unit's investigation into the purported error, whether they substantiated that an error occurred, and if so, what they uncovered about the nature of the error. This is important because Plaintiff alleged that he did not request a refill until May 16th (Doc. 73, p. 4), which was two days after his prescription had expired (*see* Doc. 114-1, pp. 56, 58). Under these circumstances, it is not clear why prison officials would be responsible for a lapse in Plaintiff's omeprazole, and he did not explain as much (*see* Doc. 118). Given the facts as they currently stand, the Court is not certain that Plaintiff has sufficiently established an issue of fact as to whether there was a delay in delivering his omeprazole that can be pinned on prison officials. But the Court will give Plaintiff the benefit of the doubt in light of the fact his grievance was substantiated and will consider the May 2019 incident as it pertains to omeprazole.

Next, **the September 2019 incident**, in which Plaintiff alleged that he submitted refill requests on September 19, 2019, for docusate, laxative, amlodipine, and Excedrin, but there was a delay in receiving the refills (Doc. 73, p. 5). With respect to the laxative,

the records demonstrate that Plaintiff's refill request could not be filled because he did not have an active prescription for any type of laxative. Plaintiff made no attempt in his response to the motion for summary judgment to reconcile this fact with his allegations, or to otherwise explain why any lapse in his medication should be blamed on prison officials (*see* Doc. 118). Rather, he "adopted" the facts set forth by Defendants regarding this medication (Doc. 118, p. 2). Consequently, Plaintiff's allegations regarding laxatives will be excluded.

The same goes for the Excedrin. Plaintiff alleges that he requested a refill on September 19th, ran out on of medication on September 26th,[7] and did not get any more until October 20th. The records, however, indicate that Plaintiff received 60 Excedrin on September 16th, so he was not possibly due for a refill three days later when he supposedly requested it. Furthermore, these 60 tablets should have lasted him a minimum of 15 days and therefore he should not have run out by September 26th, like he claimed. The records also indicate that he did not receive any Excedrin on October 20th, like he claimed. Rather, he received 60 Excedrin on October 5th and 60 more on October 29th. Once again, Plaintiff made no attempt in his response to the motion for summary judgment to explain or contest the discrepancy between his allegations and the medical records (*see* Doc. 118). Rather, Plaintiff "adopted" the facts set forth by Defendants (Doc. 118, p. 2). As such, Plaintiff has not established an issue of fact as to whether his Excedrin lapsed at any point in September/October 2019, and his allegations

---

[7] Plaintiff alleged that he ran out of Excedrin 24 days before he received more on October 20th (Doc. 73, p. 5). Twenty-four days prior to October 20th is September 26th.

regarding Excedrin will be excluded from consideration. The Court will consider the September 2019 incident only as it pertains to docusate and amlodipine.

Finally, **the March 2020 incident**, in which the medical records show that Plaintiff reported on March 16, 2020, that he had run out of fiber pills (Doc. 114-7, pp. 22). There is no evidence in the record that Plaintiff requested a refill before his prescription expired on March 9, 2020 (*see* Doc. 73, Doc. 118). Therefore, this cannot be considered an instance in which Plaintiff requested a medication refill but there was a delay in delivering it to him.

That leaves as summary judgment evidence, the following eight incidents:

- April 2018: Plaintiff's omeprazole was not delivered to him for over a week following his arrival at Lawrence
- November 2018: Plaintiff was prescribed Excedrin but still had not received it six days later
- May 2019: Plaintiff submitted a refill request on May 16th for omeprazole but there was a delay in receiving the refill;
- August 2019: Plaintiff did not receive his Excedrin until eight days after it was prescribed;
- September 2019: there was a delay in delivering Plaintiff's refills of docusate and amlodipine to him;
- October 2019: there was a delay in delivering Plaintiff's refill of omeprazole to him;
- April 2020: there was a delay in delivering Plaintiff's refills of docusate, laxative, and omeprazole to him; and
- May 2020: there was a delay in delivering Plaintiff's refill of hemorrhoid cream to him.

### 1. Lori Jackman

Of the evidence that remains, Plaintiff alleges that six incidents were Defendant Jackman's fault: the April 2018, May 2019, September 2019, October 2019, April 2020, and May 2020 incidents (*see* Doc. 73, pp. 4–6). However, Plaintiff failed to develop and submit

*any evidence* that affirmatively shows, or even impliedly suggests, that Defendant Jackman was responsible for any delays that occurred.

It is undisputed Jackman's role in prescription medication process was limited to submitting new prescriptions and refill requests to the pharmacy (*i.e.,* calling the prescriptions into the pharmacy) and then putting the filled/refilled medications in the medication room at the facility (Doc. 114-2). Plaintiff did not put forth any evidence showing that in these six instances the purported delays occurred within the two steps of the process that Jackman was involved in. For example, he did not provide any evidence showing when his refill requests were received by the facility versus when Jackman called in the prescriptions to the pharmacy. Nor did he provide any evidence of when the prescriptions were filled and delivered to the prison by the pharmacy versus when Jackman took the prescriptions to the medication room for distribution to the inmate. While Plaintiff knows that there was a delay in receiving his medications, he simply assumes the delays were attributable to Jackman.

There is a very real possibility that the delays occurred during parts of the medication refill process that were not within Jackman's control—*e.g.,* the prescription was expired and had to be renewed by the physician before it could be filled, medical requests were not collected every day, the medications were backordered at the pharmacy, the medications were filled but sat in the medication room undelivered. At this point, Plaintiff offers nothing more than his own unsubstantiated speculation that Jackman is responsible for the delays, which of course is insufficient to raise an issue of fact and survive summary judgment. *Houlihan v. City of Chicago*, 871 F.3d 540, 554 (7th

Cir. 2017) (citation omitted). *See also Bass v. Joliet Pub. Sch.Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014) ("Speculation is no substitute for evidence at the summary judgment stage."); *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[I]t is well-settled that speculation may not be used to manufacture a genuine issue of fact.") (citation omitted); *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) ("[M]ere speculation or conjecture will not defeat a summary judgment motion.") (internal quotation marks and citation omitted).

Accordingly, Defendant Jackman is entitled to summary judgment on Count 3.

## 2. Wexford

A private corporation that has contracted to provide essential government services, like Wexford, can be held liable under § 1983 for constitutional violations based on the *Monell* theory of municipal liability. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (*en banc*). Under *Monell*, a plaintiff must show that his constitutional injury was caused by the corporation's own actions. *Pyles v. Fahim*, 771 F.3d 403, 409–10 (7th Cir. 2014) (quoting *Minix v. Canarecci,* 597 F.3d 824, 832 (7th Cir.2010)). There are three primary ways in which one might prove that the corporation itself inflicted the harm: the alleged unconstitutional action implements or executes an official policy, the action was done pursuant an informal but widespread and well-settled practice or custom, or the action was taken by an official of the corporation with final policymaking authority. *Thomas v. Martija*, 991 F.3d 763, 773 (7th Cir. 2021); *Glisson*, 849 F.3d at 379.

In Count 3, Plaintiff alleged Wexford was deliberately indifferent in implementing and maintaining a policy that resulted in a failure to timely refill his prescription

medications. This claim does not appear to invoke the first theory of liability under *Monell*; Plaintiff makes no argument that Wexford's prescription refill policy was unconstitutional as written (*see* Doc. 118), nor does the policy seem constitutionally problematic on its face (*see* Doc. 114-4). Rather, Plaintiff seems to be proceeding on the second theory of liability: a widespread custom or practice. To support a § 1983 claim on this theory, Plaintiff must show that Wexford's "practice in refilling prescriptions violated his constitutional rights," meaning the medications were medically necessary to treat his serious health conditions but were not provided in a timely manner, exposing him to a substantial risk of serious harm or pain. *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1527 (2021) (quoting *Phelan v. Cook Cty.*, 463 F.3d 773, 789, 790 (7th Cir. 2006)). Plaintiff must also show that the "practice was 'so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision.'" *Hildreth*, 960 F.3d at 426 (quoting *Phelan*, 463 F.3d at 789, 790). "This requires 'more than a showing of one or two missteps.' There must be 'systemic and gross deficiencies.'" *Hildreth*, 960 F.3d at 426 (quoting *Phelan*, 960 F.3d at 426)). The Seventh Circuit "ha[s] said in general terms that an inmate can meet this burden by offering 'competent evidence tending to show a general pattern of repeated behavior (*i.e.*, something greater than a mere isolated event." *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016) (quoting *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006)). *See also Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021) ("What is needed is evidence that there is a true [corporate] policy at issue, not a random event. . . . [It cannot just be] the isolated wrongdoing of one or a few rogue employees . . . .").

The Court opts to skip over the first prong as to whether each of the prescriptions at issue were *necessary* to treat a serious medical condition (as opposed to being merely beneficial) and Plaintiff faced a serious risk of harm without them. The Court will instead address whether Plaintiff has provided evidence sufficient to show a practice of delaying prescriptions was widespread, "which is the 'pivotal requirement' of his § 1983 claim." *Hildreth*, 960 F.3d at 426 (quoting *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008)). As the Seventh Circuit has previously noted, in any large institution, it is expected that there would be some lapses in health care caused by things such as errors in scheduling and record-keeping. *Daniel*, 833 F.3d at 734. The Court thinks it is also reasonable to expect some delays in filling prescriptions. "The challenge in litigation like this is to distinguish between systemic problems showing official deliberate indifference and occasional lapses that are inevitable even in well-run institutions." *Id.*

Here, the evidence remaining shows that there were eight alleged instances involving 11 medications over the course of approximately two years where Plaintiff experienced a delay in receiving one or more medications. Importantly, Plaintiff did not present any evidence that other inmates also experienced medication delays (*see* Doc. 118). The Seventh Circuit has held that "[w]hile it is not 'impossible' for a plaintiff to demonstrate a widespread practice or custom with evidence limited to personal experience, 'it is necessarily more difficult . . . because what is needed is evidence that there is a true municipal policy at issue, not a random event.'" *Hildredth*, 960 F.3d at 426 (quoting *Grieveson*, 538 F.3d at 774).

The Court does not think this is a case where the incidents are so numerous to

satisfy the "more difficult" task of proving a custom with only evidence of personal experience. Eight instances within 25 months may seem like a lot at first blush. That means every three months, Plaintiff had a problem getting one or more of his medications, which a reasonable jury could undoubtedly find problematic. However, when the Court considers the total number of prescriptions Plaintiff had filled within the 25-month span, suddenly the delayed receipt of 11 medications seems like an "occasional laps[e] that [is] inevitable even in well-run institutions," rather than a systemic problem. The medical records show that Plaintiff had somewhere close to 200 prescriptions filled/refilled within the 25-month period at issue (in addition to two mental health medications and one pain medication that was administered to him several times a day) (*see* Doc. 114-1, pp. 22–89; Doc. 114-7, pp. 51–100). He routinely had five to seven prescriptions filled each month, and some months he had as many as 10 to 12 filled (*see id.*). He has provided evidence that 11 prescriptions out of approximately 200 — or 5-6% of his prescriptions — were delayed in reaching him. No reasonable jury would conclude that this evidences a widespread practice or custom of delaying medication refills.[8]

---

[8] *Hildreth v. Butler*, 960 F.3d 420, 427 (7th Cir. 2020) (holding three instances over nineteen months of one inmate's prescription refill being delayed "fail[ed] to qualify as a widespread unconstitutional practice so well-settled that it constitutes a custom or usage with the force of law."); *Pittman ex rel Hamilton v. Cty. of Madison*, 746 F.3d 766, 780 (7th Cir. 2014) (holding 36 suicide attempts and three suicides in a five-year period (or 7.8 incidents per year) was not enough evidence of a widespread inadequate suicide policy); *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (holding 27 complaints of excessive force over three years (or 9 incidents per year) were insufficient to establish a pattern); *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (holding 11 incidents of warrantless entry over a four-year period did not support an unconstitutional pattern); *Carter v. District of Columbia*, 795 F.2d 116, 123 (D.C. Cir. 1986) (holding six prior incidents of alleged misconduct over approximately two years did not establish pattern of excessive force). *See also Conquest v. Berge*, 44 Fed. Appx. 3, 4 (7th Cir. 2002) (holding no reasonable factfinder could conclude that nine instances of delay in administering oxycodone over thirteen months "were anything but isolated instances of neglect, and negligence is not deliberate indifference.")

The Court understands why Plaintiff was frustrated each time the prison failed to refill one of his prescriptions in a timely manner. Anyone would be. But the simple fact is that of the dozens upon dozens of prescriptions that Plaintiff had filled/refilled every year, only a handful of them were delayed in being delivered to him. That is simply not enough to show a widespread and pervasive problem. Consequently, Wexford is entitled to summary judgment on Count 3.

CONCLUSION

The motion for summary judgment filed by Defendants Wexford Health Sources, Inc., Lori Jackman, and Heath Ellison (Doc. 113) is **GRANTED.** They are **DISMISSED with prejudice** as Defendants in this case. Judgment will be entered in their favor at the close of the case.

As noted in this Order, the Court is skeptical that Docs. 114-4, 114-6, and 114-9 should remain sealed. *See supra* at pp. 2-3. However, before unsealing these documents, the parties have until **April 5, 2023** to object to unsealing them. *See supra* at p. 3. Objections must be made with specificity and citations to legal authority. If no response is filed, or the parties fail to provide the Court with a compelling justification, the exhibits will be unsealed.

**IT IS SO ORDERED.**

**DATED: March 29, 2023**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**
